IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KRYSTA E. VAN CLEVE, | ) | |
| | ) | No. 14 C 5061 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Sidney I. Schenkier |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Krysta E. Van Cleve, has moved for reversal and remand of the final decision of the Commissioner of the Social Security denying her claims for disability benefits (doc. # 17). The Commissioner has filed a motion seeking affirmance of the decision denying benefits (doc. # 19). For the reasons that follow, we deny plaintiff's motion and affirm the ALJ's decision.

## I.

Ms. Van Cleve applied for benefits on August 11, 2011, alleging she became disabled beginning on March 9, 2009, at age 42, due to anxiety, depression, chronic asthma, chronic obstructive pulmonary disease ("COPD"), and various spinal injuries (R. 187, 209). Ms. Van Cleve completed high school and one year of college, and between 2002 and 2009, she held a variety of skilled positions, including a bank branch manager, human resources manager and executive recruiter (R. 210-11). After her claim was denied initially and upon reconsideration, Ms. Van Cleve appeared and testified before an administrative law judge ("ALJ") at a hearing on November 16, 2012; a vocational expert ("VE") and two medical experts ("MEs") also testified.

---

[1]On July 18, 2014, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 6).

On January 17, 2013, the ALJ issued a written decision denying benefits and finding Ms. Van Cleve was not disabled from her alleged onset date through the date of the opinion (R. 27). The Appeals Council denied her request for review, and Ms. Van Cleve now appeals the ALJ's finding that she was not disabled. Because the Appeals Council denied review, we review the ALJ's decision as the final word of the Commissioner. *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015).

## II.

We begin by summarizing the pre-hearing record. On August 30, 2011, Ms. Van Cleve completed a function report for her disability application (R. 225-35). She described suffering from: severe asthma which required the use of a breathing machine day and night; severe anxiety which paralyzes her throughout the day; inability to follow instructions or communicate in a social setting; difficulty writing, reading and doing simple math; and back problems that prevent her from sitting or standing for "a period of time" (R. 225-26). Nevertheless, she spent one hour daily doing housecleaning, laundry, vacuuming, washing dishes and/or cooking. She had no problems with her personal care, though she sometimes forgot to bathe, and she could drive and go shopping by herself (R. 226-28). Ms. Van Cleve also wrote that she spent most of her time watching television, took narcotic medication for her back pain, did not use kitchen tools and carried only light shopping bags (R. 229-34).

From March through July 2009, Ms. Van Cleve had monthly clinic visits to Wisconsin-based physician Paul Thompson, M.D., during which she complained of, and received medication for, panic attacks, moderate depression, and severe asthma (R. 370-87). On October 1, 2009, she reported that her major depression, panic disorder, and asthma were well-controlled and that she smoked 3/4 pack of cigarettes daily (R. 391). Ms. Van Cleve also presented with a

new problem, daily chronic low back pain, which she attributed to a vehicular accident that occurred several years prior (*Id.*). Dr. Thompson prescribed Norco for the back pain (*Id.*).[2]

On October 19, 2009, plaintiff went to the hospital with an asthma attack after she ran out of Albuteral and did not have access to her nebulizer (R. 436). At the hospital, her asthma was controlled with intravenous steroids (R. 437).[3] About seven months later, on May 31, 2010, plaintiff again went to the hospital with an asthma attack; she was prescribed medication and released (R. 313-15).

Ms. Van Cleve sought additional Norco from Dr. Thompson between February and November 2010, but he refused to refill her prescription because she did not come in to see him (R. 394-98). In March 2010, after moving to Illinois, Ms. Van Cleve visited the VNA Health Center in Aurora, where she requested and received a Norco refill for her back pain (R. 515-16). She received additional Norco refills and asthma medication during subsequent visits to the VNA Health Center in April, September and December of that year (R. 506-14). During these visits, Ms. Van Cleve also reported suffering panic attacks and depression, and she was prescribed Xanax and Celexa (*Id.*). At her December 2010 visit to the VNA Health Center, she reported that she attempted suicide with a shotgun in August 2010, after she had not been taking her medications for 4 months, but the bullet hit the ceiling (R. 506). Ms. Van Cleve received refills of albuterol, Norco and her mental health medications in May, July, August, October and December 2011 from the VNA Health Center (R. 496-504). The physician added a prescription for Gabapentin (nerve pain medication and anti-convulsant) in October 2011 (R. 498).

---

[2]Norco is a narcotic pain medication made up of acetaminophen and hydrocodone. Vicodin is another brand name for this drug. For ease of reference, we refer to prescriptions for Norco or Vicodin as Norco.

[3]At the hospital, Ms. Van Cleve also noted that she had occasional hand and feet numbness (R. 436).

Ms. Van Cleve also made at least eleven visits to Abdul Qadir, M.D., in Aurora during this time, from November 2010 through November 2011 (R. 343-53, 585-88). Ms. Van Cleve complained of chronic low back pain, asthma and eczema, and Dr. Qadir prescribed Norco at each visit, and occasionally albuterol and ointment for eczema (*Id.*). Her physical exams were unremarkable at these visits, and she had no back spasms (*Id.*). An X-ray of her cervical spine on May 12, 2011 showed mild degenerative disease in the middle of her thoracic spine (R. 447).

On October 1, 2011, Ellen Rozenfeld, Psy.D. completed a mental residual functional capacity ("RFC") assessment, without conducting an independent examination (R. 471). She found that Ms. Van Cleve had severe mental health impairments -- depression, not otherwise specified, and panic disorder without agoraphobia -- but that they did not meet or equal a listing, and that Ms. Van Cleve retained sufficient mental capacity to perform work-like tasks on a sustained basis (R. 462, 464, 471). In the Paragraph B criteria, Dr. Rozenfeld opined that Ms. Van Cleve had mild restriction in activities of daily living ("ADLs") and in maintaining social functioning, but moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation of extended duration (R. 469, 473). Dr. Rozenfeld stated that Ms. Van Cleve was only partially credible and noted inconsistencies between her reported range of ADLs and her report that severe anxiety paralyzes her throughout the day (R. 475).

On October 4, 2011, Muhammad Rafiq, M.D., conducted a physical examination of Ms. Van Cleve for the Bureau of Disability Determination Services ("DDS"). Ms. Van Cleve reported that she gets short of breath easily and that she had experienced constant neck and upper back pain at a level of 2 to 10 out of 10 since 2008, when she was in a motor vehicle accident (R. 477-78). She reported that she could walk up to one mile, stand for up to 30 minutes at a time, sit normally, lift up to 20 pounds of weight, climb up to one flight of stairs at a time, and had no

trouble vacuuming, cooking, bathing, dressing, driving and shopping (R. 478). In addition, Dr. Rafiq's examination showed that Ms. Van Cleve had normal range of motion and strength in her spine and lower extremities (R. 479).

Young-Ja Kim, M.D., completed a physical RFC assessment of Ms. Van Cleve on October 21, 2011, listing her primary diagnosis as degenerative disease of the cervical spine (neck) and thoracic (upper/middle) spine, and secondary diagnoses of LEP[4] and asthma (R. 482). Dr. Kim noted that MRIs of the cervical and thoracic spine revealed some degenerative disc disease, but Dr. Kim found that plaintiff could still lift 50 pounds occasionally and 25 pounds frequently, and stand or walk for approximately six hours a day, with unlimited pushing and pulling (R. 483). Dr. Kim also found plaintiff only partially credible because her report of difficulty walking was disproportionate to the evidence in the file (R. 487).

On December 20, 2011, plaintiff visited a hospital emergency room after tripping and falling at a nail salon (R. 528). She stated that she experienced pain in her right foot and ankle, as well as cervical and thoracic pain (*Id.*). Ms. Van Cleve was diagnosed with a right calcaneal (heel) fracture, with cervical, lumbar and thoracic strain (R. 536). An x-ray showed degenerative changes throughout the cervical spine, including disc space narrowing in various parts of the spine (R. 530). She was advised to visit an orthopedic surgeon for follow-up and to avoid weight-bearing to her right lower extremity (R. 537). She was prescribed Norco as needed for pain (*Id.*).

Ms. Van Cleve sought follow-up treatment for her foot and ankle at Castle Orthopaedics & Sports Medicine (R. 565). On December 23, 2011, Robert Paras, M.D., prescribed Flexeril (a

---

[4]Dr. Kim does not define or explain the term "LEP," and it is not clear from where Dr. Kim derived this diagnosis, but it may refer to lupus erythematosus panniculitis. Lupus erythematosus is an autoimmune disease in which the body's immune system mistakenly attacks healthy tissue. https://www.nlm.nih.gov/medlineplus/ency/article/000435.htm. Panniculitis is a general term for inflammation of adipose (fat) tissue, usually of the skin, characterized by reddened nodules. http://ghr.nlm.nih.gov/glossary=panniculitis.

muscle relaxant) and Norco for her ankle and neck pain (R. 565-66), and on December 28, 2011, he placed plaintiff in a short leg non-weight-bearing cast (R. 563). In January 2012, her cast was removed, and Ms. Van Cleve reported improvement in her foot pain, but worsening neck and low back pain (R. 561). Dr. Paras refilled her prescriptions for Norco and Flexeril for her neck and back complaints (*Id.*). Another doctor at Castle Orthopaedics, Scott O'Connor, M.D., reported that by the end of February 2012, Ms. Van Cleve's fracture appeared to be healed, though she still had some swelling and mild tenderness and preferred to walk with a CAM walker boot (R. 556-59). Ms. Van Cleve complained of worsening neck and back pain, and Dr. O'Connor observed no loss of sensation or motor strength in her lower extremities, slightly limited range of motion in her cervical spine and mild tenderness across her back (R. 559-61).

Ms. Van Cleve also visited Dr. Qadir from February through July 2012. He continued to prescribe Norco, adding a prescription for Flexeril in March and April 2012 (R. 579-84). In August 2012, Dr. Qadir wrote that he discussed with Ms. Van Cleve that she had been on narcotic pain medication for a long time and should consider tapering off of it (R. 578). He also listed "fibromyalgia" in addition to chronic pain under his assessment for the first time, without an explanation for the new diagnosis (*Id.*). Dr. Qadir did not prescribe Norco in September 2012 (R. 577), but he again prescribed Norco, in addition to prednisone and albuterol, in October 2012 (R. 576). Dr. Qadir noted that Ms. Van Cleve's physical examinations remained unremarkable with no back spasms during this time.

Ms. Van Cleve also attended physical therapy from March 19 to May 24, 2012 (R. 547). She reported pain at a level of 8 to 10 in her back, neck, and foot most of the time, and she was discharged from physical therapy with no improvement reported (*Id.*). The physical therapist noted that Ms. Van Cleve's gait was inconsistent; the therapist observed that Ms. Van Cleve's

gait had abnormalities when she was supervised, but she had a mostly normal reciprocal gait when unsupervised (*Id.*).

Between June and October 2012, plaintiff also had a few appointments with Gowher Khan, M.D. His hand-written notes from those visits, only some of which are legible, appear to reflect Ms. Van Cleve's self-reports (R. 591-96). At her initial meeting with Dr. Khan on June 11, 2012, Ms. Van Cleve complained of arthritis and lower back and neck pain and reported taking Norco, Xanax, Celexa and Flexeril (R. 595). Dr. Khan's initial assessment listed fibromyalgia, degenerative joint disease in her shoulders, insomnia, and anxiety/depression (R. 596). Dr. Khan's notes do not reflect any testing he did in reaching his assessment of fibromyalgia. He recommended Ms. Van Cleve follow-up with a podiatrist for her right heel issues, and he prescribed Tramadol (narcotic to treat moderate to severe pain) and Norco (*Id.*). Dr. Khan also ordered MRIs of Ms. Van Cleve's lumbar and cervical spine. The MRIs, from June 15, 2012, showed early degenerative change in her lumbar spine and degenerative change in her cervical spine with disc disease at C4-C5 and C6-C7 levels and diffuse posterior disc bulges at C4-C5, C5-C6 and C6-C7 (R. 597-600).

After cancelling two appointments, Ms. Van Cleve next saw Dr. Khan for medication refills and follow-up on July 9, 2012 (R. 594). On August 16, 2012, Ms. Van Cleve saw Dr. Khan again for follow-up and refills, and Dr. Khan noted that "Tramadol [was] helping her" (R. 593). At that appointment, in addition to repeating his prior notes, Dr. Khan added "R hand" and joint pain (*Id.*). At her next and last meeting with Dr. Khan in the record, on October 29, 2012, Dr. Khan listed Ms. Van Cleve's prior complaints and prescription medications (R. 591-92).

## III.

A hearing before the ALJ took place on November 16, 2012. At the hearing, the ALJ received testimony from plaintiff, two MEs and a VE. We summarize that testimony below.

### A.

Plaintiff testified that she stopped working in March 2009 because she could not sit for a long time due to severe neck and back pain, which led her to take excessive breaks during the work day and to miss too many days of work (R. 62, 64-67). She described her neck pain as a daily, but not constant, "stab wound" and her low to mid back pain as sharp and constant (R. 70-72). Ms. Van Cleve also testified that she had pain in both her hands (*Id.*), and residual heel, ankle and foot pain from her fracture (R. 84). She attributed her continued pain to fibromyalgia, which she said Dr. Khan diagnosed due to her years of pain (R. 70-71). Ms. Van Cleve also testified that a doctor said surgery may heal her foot problems, but that with fibromyalgia, surgery had less than a 50 percent chance of success (R. 85).

Ms. Van Cleve testified that she took Flexeril and Norco for pain (R. 72). Norco gave her partial pain relief but she still had paralyzing back spasms (R. 79-80). She had also been prescribed Prednisone (for inflammation), but she did not take it consistently because it caused bloating and insomnia (R. 83-84). The ALJ noted that the record showed a number of different doctors prescribing the same medicine, and he questioned whether Ms. Van Cleve had a substance abuse problem (R. 78). Ms. Van Cleve testified that the doctors did not prescribe the drugs at the same time, and she did not take more than the prescribed dosage (R. 78, 104).

Ms. Van Cleve testified that she could stand up to 20 minutes and sit for 45 to 60 minutes before her neck pain became unbearable, and she cannot type with two hands because of pain in her hands (R. 85-86, 97-98). She also stated that she could not lift more than 5 pounds, needed

assistance cooking and washing dishes because she often dropped things and forgot to turn off the burners, and she no longer vacuumed (R. 87-88, 98-99). Plaintiff also testified that she only showered once per week because it was painful to lift her arms to wash and dry her hair (R. 99).

For her asthma, Ms. Van Cleve testified that she takes Advair and Flovent daily and uses a nebulizer machine up to three times per week as needed (R. 81). She testified that she has "issues every day all day with asthma," including wheezing and gasping, which sometimes became severe enough to need a breathing machine (R. 82). Plaintiff stated that her asthma is often triggered by activity, cold weather, allergies and lying flat (R. 82-83).

Regarding her mental impairments, Ms. Van Cleve testified that she regularly felt sad and hopeless (R. 88). She testified that once, in September 2010, she attempted suicide with a shotgun, but it discharged and went through the ceiling (R. 89). She stated that she reported it to a doctor, but she was embarrassed (R. 90). She also stated that she has "cognitive issues" that affect her short-term memory and ability to concentrate, and she can no longer spell, do math or use proper grammar (R. 96-97, 100).

## B.

Two medical experts also testified at the hearing. Dr. Kamarius opined on Ms. Van Cleve's mental impairments, and Dr. Rausch opined on her physical impairments. No further information was given as their names or specialties.

Dr. Kamarius testified that Ms. Van Cleve received some therapeutic benefit from medication for her anxiety and depression, but that the symptoms had never been resolved (R. 51-52). In Dr. Kamarius's view, Ms. Van Cleve's mental impairments were severe but did not meet a listing: she had moderate difficulties in maintaining social functioning and concentration, persistence, or pace, but only mild restriction in ADLs and no episodes of decompensation (R.

9

52-54). Dr. Kamarius generally agreed with the DDS mental health RFC analysis that Ms. Van Cleve could not perform complex tasks, but could do simple, routine and repetitive tasks with only brief and superficial contact with coworkers and supervisors and incidental contact with the public (R. 54).

Regarding plaintiff's physical impairments, Dr. Rausch testified that Ms. Van Cleve had asthma, degenerative arthritis in her upper and lower spine, and a fracture of the right heel bone (R. 56-57). Dr. Rausch noted a diagnosis of fibromyalgia on July 9, 2012, but Dr. Rausch did not see evidence of traditional trigger points or classic symptoms associated with it and no EMG evidence documenting neuropathy (R. 58-59). Dr. Rausch opined that Ms. Van Cleve had a severe impairment that did not meet a listing, and he would ascribe a sedentary RFC to Ms. Van Cleve, with the ability to occasionally reach overhead with her upper extremities (R. 59-61).

## C.

The VE testified that Ms. Van Cleve's past relevant work experience was mostly skilled and sedentary, though some work was described as light or medium by the claimant (R. 105). The VE opined that only one position would be available for plaintiff to perform: a bench hand assembler, an unskilled position at the sedentary level that required only incidental contact with the public (R. 106). However, an individual whose ability to reach and handle were limited significantly, or who could not be on task about 90 percent of the day, could not work as a bench hand assembler (R. 107-08).

## IV.

On January 17, 2013, the ALJ issued a written opinion finding that plaintiff was not disabled. Initially, the ALJ stated that Ms. Van Cleve met the insured status requirements of the Social Security Act ("Act") from the alleged onset date of March 9, 2009, through at least the

date of the decision (R. 27). At Step 1 of the five-part sequential analysis, the ALJ found that plaintiff did not engage in substantial gainful activity since her alleged onset date (R. 28).

At Step 2, the ALJ found that the combination of plaintiff's impairments was severe -- the ALJ referred to the impairments Ms. Van Cleve listed on a disability report in August 2011, including cognitive problems, anxiety, depression, asthma, COPD, spine and neck injuries, and upper extremity pain -- but the ALJ did not state which particular alleged impairments were severe (R. 28-31). At Step 3, the ALJ concluded that none of plaintiff's impairments met or equaled the criteria of any listed impairment, specifically identifying Listings § 1.04 (disorders of the spine), §§ 3.02 and 3.03 (respiratory impairments), and §§ 12.04 and 12.06 (mental health impairments) (R. 31). The ALJ relied on the ME's testimony in finding that, "given the claimant's complaints, and finding on imaging of the claimant's cervical spine, it was *possible* that the claimant has the required nerve root compromise required under [Listing 1.04] . . . but that it is not established; even clinically" (*Id.*, emphasis in original).

The ALJ concluded that plaintiff was not disabled, and had the RFC to perform a range of unskilled, sedentary work on a sustained basis (R. 31). In determining the RFC, the ALJ gave the greatest weight to the medical opinions of the MEs, Drs. Rausch and Kamarius, and adopted the mental and physical health limitations they suggested in their testimony at the hearing, which would allow Ms. Van Cleve to perform a restricted range of unskilled and sedentary work (R. 40). The ALJ determined that Ms. Van Cleve did not have an impairment that would limit her ability to reach or use her hands, or that would result in her being excessively absent or off-task (*Id.*). At Step 4, the ALJ found that plaintiff could not perform her past work. However, at Step 5, he found that Ms. Van Cleve was not disabled because she could perform the job of hand bench assembler, as described by the VE at the hearing (R. 41). In

making his RFC determination, the ALJ reviewed each of plaintiff's alleged impairments and found that the medical evidence provided little support for her allegations concerning the frequency, duration and intensity of her impairments (R. 31, 34, 39).

*First*, the ALJ found no evidence to support Ms. Van Cleve's claim that she had fibromyalgia despite a diagnosis by Dr. Khan, a rheumatologist (R. 35). The ALJ instead adopted Dr. Rausch's findings that there were no documented trigger points or classic signs of fibromyalgia in the record (R. 30, 40).

*Second*, the ALJ did not find credible Ms. Van Cleve's testimony that she has had severe pain and limited functionality in her hands for years (R. 32, 35). The ALJ noted that she did not allege any difficulty using her hands in her application for benefits, and she had normal function and no pain in her hands at the internal consultative medicine evaluation on October 4, 2011 (R. 36). The only medical records reflecting hand problems were her complaints in June and August 2012 of occasional hand numbness and pain (*Id.*), and no electrodiagnostic testing had been done to establish any neuropathy or radiculopathy in Ms. Van Cleve's upper extremities (R. 30).

*Third*, the ALJ determined that despite her testimony to the contrary, Ms. Van Cleve's medications were effective in controlling her asthma (R. 38). Though she went to the hospital twice with asthma attacks, these resulted from her failure to properly use her medication, including her nebulizer (*Id.*). The ALJ also did not believe Ms. Van Cleve's testimony that she experienced daily episodes where she could not breathe due to her asthma, because she does not use her prescribed prednisone (due to the alleged side effects of bloating and insomnia), only uses a nebulizer up to three times per week, and continues to smoke (R. 37-38).

*Fourth*, the ALJ doubted Ms. Van Cleve's testimony that she continued to have pain in her heel since she fractured it in December 2011. Ms. Van Cleve testified that she was told that

the fracture did not heal correctly and she would need surgery to resolve it, but that surgery was not recommended because it had only a 50 percent chance of success on people with fibromyalgia (R. 32). However, contrary to Ms. Van Cleve's testimony, the ALJ found that treatment records from her orthopedist said her fracture had healed by February 28, 2012, and the orthopedist did not make any recommendation for additional surgery (R. 36).

*Fifth*, the ALJ did not believe that Ms. Van Cleve had back pain as severe or limiting as she claimed. While she consistently complained of back pain, there were no abnormal clinical findings in 2009 and 2010, and the internal consultative examination from October 2011 showed no limitations in Ms. Van Cleve's range of motion, no pain on straight leg raising, normal gait, and full motor strength, sensation and reflexes (R. 34-35). In addition, while Ms. Van Cleve complained of worsening back pain and limitations in the second half of 2012 -- one physician even documented marked limitations in range of motion and tenderness in her neck on June 7, 2012 -- the ALJ found that her alleged degree of limitation could not be reconciled with the medical evidence (R. 33). In a disability report she filled out in July 2012 and at the hearing, Ms. Van Cleve alleged that she had back spasms one to three times daily, which essentially paralyzed her and left her homebound (R. 33, 38). However, no doctor ever described her as having back spasms or being unable to move, and from November 2010 through October 2012, Dr. Qadir documented that Ms. Van Cleve had no back spasms and was neurologically intact (R. 34-35).

*Sixth*, while the ALJ acknowledged that the medical record showed that Ms. Van Cleve was anxious and depressed at times, the ALJ found that her mental health examinations reflected normal thought processes, intact memory and normal attention and concentration, and her mental impairments were controlled with medication (R. 33, 37). While Ms. Van Cleve claimed that she

attempted suicide in August 2010, she had also allegedly failed to take her prescribed mental health medications for four months prior to that time (R. 36).

In addition to the lack of objective medical evidence supporting her alleged impairments, the ALJ suspected that the medical evidence showed that Ms. Van Cleve may have been abusing her prescribed medications. "Treatment records suggest that the claimant has not used her pain medications properly . . ., including not using medications as prescribed or using up the medications before refills were authorized" (R. 38). The ALJ noted that Ms. Van Cleve had multiple prescriptions for the same medications from multiple medical sources (R. 28). In addition, she mostly presented to Dr. Qadir and other physicians for medication refills, rather than for evaluation and treatment of specific complaints, and when she went to the emergency room in May 31, 2010 with an asthma attack, she left with a refill for hydrocodone and a muscle relaxant for her back pain, despite no abnormal clinical findings concerning her back (R. 35).

Moreover, the ALJ noted that "[t]here are no reports suggesting that the claimant has tried other measures to relieve her pain or other symptoms" (R. 39). In fact, the only other treatment Ms. Van Cleve did receive -- physical therapy from March through May 2012 -- was discontinued with no reported improvement, and with the physical therapist reporting that "the claimant's mobility was limited when supervised (*i.e.*, obviously observed), and mostly normal when unsupervised (*i.e.*, surreptitiously observed)" (R. 38).

The ALJ also determined that Ms. Van Cleve's activities of daily living were inconsistent with her alleged limitations. When she initially filed her application for benefits, Ms. Van Cleve represented that she could prepare her own meals, do the laundry, clean, vacuum, wash dishes, and shop (R. 33). In addition, at the October 2011 internal medicine evaluation, she reported that she could walk up to one mile, stand for up to 30 minutes, sit normally, lift up to 20 pounds, and

climb a flight of stairs, vacuum, cook, bathe, dress, drive and shop (*Id.*). However, at the hearing, Ms. Van Cleve testified that she could not lift more than five pounds at a time or stand more than 20 minutes at a time due to stabbing neck pain and constant lower back pain (R. 34, 37-38). The ALJ found that "[t]he medical evidence does not show a progression of any impairment that would explain the[se] changes in her activities of daily living" (R. 34).

Finally, the ALJ pointed to several other inconsistencies that caused the ALJ to doubt the credibility of Ms. Van Cleve's allegations of pain and functional limitations: (1) during the period at issue, she received unemployment compensation benefits, which required that Ms. Van Cleve warrant that she is "ready, willing, and able to work, and to conduct job searches" (R. 28, 39); (2) no treating physician provided an opinion concerning any functional limitations of the claimant (R. 39); (3) despite saying in her application that she stopped working in March 2009, in May 2009, Ms. Van Cleve did "a lot of physical work" getting her rental properties ready to rent (*Id.*); and (4) despite stating in her August 2011 disability application that she stopped working 2009, she was managing her rental properties as late as May 2011 (*Id.*).

## V.

"We review the ALJ's decision deferentially only to determine if it is supported by substantial evidence," that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014) (internal citations and quotations omitted). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

Ms. Van Cleve argues that we should remand here because: (1) the ALJ erroneously concluded that she did not meet Listing 1.04;[5] (2) the ALJ did not properly consider her diagnosis of "FMS"; and (3) the ALJ made an improper credibility determination that resulted in an improper Step 5 analysis (doc. # 18: Pl.'s Mem. in Supp. of Summ. J. at 8). We consider, and reject, each of these challenges.

## A.

Plaintiff argues that the ALJ erred in determining that she did not meet Listing 1.04. If a claimant has an impairment that meets or equals an impairment found in the Listing of Impairments, a claimant is presumptively eligible for benefits. 20 C.F.R. § 404.1520(d). A claimant meets Listing 1.04 if he or she has a disorder of the spine resulting in compromise of a nerve root or the spinal cord with: (A) "evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test;" or (B) spinal arachnoiditis; or (C) "lumbar spinal stenosis resulting in pseudoclaudication,[6] established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively. . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.

"In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than perfunctory analysis of the listing." *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015) (quoting *Barnett v. Barnhart*, 381 F.3d 664,

---

[5] We note that the ALJ also found that plaintiff's impairment did not meet or equal Listings 3.02, 3.03, 12.04 and 12.06 (R. 31). Plaintiff does not challenge those determinations.

[6] Pseudoclaudication causes leg pain while standing or walking. It can be a symptom of lumbar spinal stenosis, a condition that occurs when the spaces narrow between the vertebrae in your lower back. http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/expert-answers/pseudoclaudication/faq-20057779.

668 (7th Cir. 2004)). Ms. Van Cleve argues that in determining that she did not meet Listing 1.04, the ALJ here "simply stated that the ME said there was evidence of nerve root compromise, although it was not proven clinically," "provided little to no analysis of the evidence in the record," and "did not evaluate any of the evidence on its required criteria that was favorable to the claimant" (Pl.'s Mem. at 9-10).

Contrary to plaintiff's argument, the ALJ offered more than a perfunctory analysis of whether Ms. Van Cleve met Listing 1.04. The ALJ indeed relied on the ME's testimony that, "given the claimant's complaints, and finding on imaging of the claimant's cervical spine, it was *possible* that the claimant has the required nerve root compromise required under [Listing 1.04] . . . but that it is not established; even clinically" (R. 31). Later in the opinion, the ALJ went farther, and explained why he agreed that clinical and imaging evidence did not support a finding that Ms. Van Cleve's back pain was as limiting as she claimed. The ALJ found that despite Ms. Van Cleve's complaints of severe and limiting back pain, there were no abnormal clinical findings in 2009 and 2010, and the internal consultative examination from October 2011 showed no limitations in her range of motion, no pain on straight leg raising, normal gait, and full motor strength, sensation and reflexes (R. 34-35). In addition, the ALJ found no support for Ms. Van Cleve's claim that she suffered from paralyzing back spasms, and the ALJ determined that Ms. Van Cleve's activities of daily living were inconsistent with her alleged limitations (R. 33, 38).

These additional comments are relevant to the Step 3 finding and provide additional support for it. The fact that the ALJ's additional comments are not found in the section of his opinion discussing Listing 1.04 is of no moment. *See Summers v. Colvin*, No. 15-1819, 2016 WL 423711, at *3 (7th Cir. Feb. 4, 2016) (holding that although the ALJ's initial Step 3 discussion was brief, "we read the ALJ's decision as a whole and later the ALJ addressed [the claimant's]

evidence more thoroughly and explained why the record did not establish the criteria required to satisfy Listing 1.04"). *See also Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015) (holding that "it is proper to read the ALJ's decision as a whole" because it would be a "needless formality" to have the ALJ repeat substantially similar factual analyses at different steps of the decision) (quoting *Rice v. Barnhart*, 384 F.3d 363, 370 n. 5 (7th Cir. 2004)). Thus, we conclude that the ALJ "sufficiently met his duty to articulate" his Step 3 finding, *see Curvin*, 778 F.3d at 650, and find that the ALJ's Step 3 determination as to Listing 1.04 is supported by substantial evidence.

## B.

Plaintiff next argues that "[t]he ALJ erred in not considering plaintiff's diagnosis with FMS in determining plaintiff's RFC" (Pl.'s Mem. at 10). Initially, we note that the term "FMS" is not used in the record. Plaintiff does not define FMS, and neither do the National Institutes of Health or the Mayo Clinic websites, although both sites discuss fibromyalgia in depth.[7] The Court has gleaned from WebMD that FMS refers to "fibromyalgia syndrome," which is a "set of symptoms" -- pain, fatigue, tender points, anxiety and/or depression -- that existing together may "imply" the presence of fibromyalgia or a greater chance of developing it.[8]

In any event, plaintiff argues that she has an FMS impairment that meets the requirements of Social Security Ruling ("SSR") 12-2p, which sets forth the criteria needed to establish fibromyalgia as a medically determinable impairment (Pl.'s Mem. at 10-12). We find that the ALJ did not err by omitting additional limitations to Ms. Van Cleve's RFC based on her claim of fibromyalgia.

---

[7]*See* http://www.niams.nih.gov/Health_Info/Fibromyalgia/fibromyalgia_ff.asp; http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/definition/con-2001924.

[8]http://www.webmd.com/fibromyalgia/guide/what-is-fibromyalgia#1.

SSR 12-2p "provides guidance" for how a claimant may establish that he or she has fibromyalgia. The Commissioner may find that a claimant has fibromyalgia if he or she can establish, by "appropriate medical evidence" (1) a history of widespread, persistent pain in all quadrants of the body; (2) at least eleven positive tender points on physical examination or repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions; and (3) evidence that other disorders that could cause the signs and symptoms were excluded. SSR 12-2p.[9] "[A]ppropriate medical evidence" cannot consist of a physician's diagnosis alone; rather, the evidence must document that the physician reviewed the person's medical history and conducted a physical exam. *Id.*

Here, Ms. Van Cleve has not provided "appropriate medical evidence" of fibromyalgia. The only references to fibromyalgia in the record are a one-time mention of this diagnosis by Dr. Qadir in June 2012, brief handwritten notes from Dr. Khan mentioning fibromyalgia later in 2012, and Ms. Van Cleve's testimony at the hearing. The ALJ must consider medical opinions in determining whether a claimant is disabled, but medical opinions are statements from acceptable medical sources that "'reflect judgments about the nature and severity' of a claimant's impairments, including the claimant's symptoms, diagnosis, prognosis, physical and mental restrictions, and residual functional capacity." *Loveless v. Colvin*, No. 15-2235, 2016 WL 147547, at *5 (7th Cir. Jan. 13, 2016) (quoting 20 C.F.R. §§ 404.1527(a)(2)). "The ALJ needed only to weigh a physician's assessments about the nature and severity of [Ms. Van Cleve's]

---

[9]SSR 12-2p states that these criteria for diagnosing fibromyalgia are generally based on the 1990 American College of Rheumatology ("ACR") Criteria for the Classification of Fibromyalgia and the 2010 ACR Preliminary Diagnostic Criteria. The two sets of criteria differ mainly in the physical symptoms and signs of fibromyalgia that must be shown. The 1990 criteria state that at least 11 positive tender points must be shown on physical examination, and the 2010 criteria refer to the repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions. SSR 12-2p (II.A.2. and II.B.2). Fibromyalgia symptoms, signs and co-occurring conditions may include muscle pain and weakness, irritable bowel syndrome, chronic fatigue syndrome, cognitive problems, headache, stomach or chest pain, numbness or tingling, dizziness, insomnia, depression, anxiety, temporomandibular joint disorder, or restless leg syndrome. *Id.*

impairments." *Loveless*, 2016 WL 147547, at *5. Drs. Qadir and Khan did not assess the nature or severity of Ms. Van Cleve's alleged fibromyalgia, and their brief references to fibromyalgia do not constitute medical opinions to which the ALJ had to assign weight.[10]

Rather, the ALJ adopted Dr. Rausch's opinion calling the diagnosis of fibromyalgia into question, because no physician documented the requisite trigger points and no electrodiagnostic testing was performed. The ALJ's decision to adopt the ME's opinion was supported by substantial evidence; the results of any assessment or evaluation by Dr. Khan -- if, indeed, he conducted one -- was not evident in the record. *See supra* note 7; *see also Mitze v. Colvin*, 782 F.3d 879, 882 (7th Cir. 2015) (where the treating physician noted the claimant's reports of persistent, chronic and severe pain, but failed to explain how the pain limited the claimant's activities, the ALJ was entitled to find that the claimant was capable of full-time employment); *see also Elder v. Astrue*, 529 F.3d 408, 416 (7th Cir. 2008) (affirming ALJ's denial of benefits for claimant with fibromyalgia where the ALJ discounted the doctor's opinion because he was not a specialist in fibromyalgia, and failed to conduct "a thorough corroborating medical exam" to assess the severity of the claimant's conditions.). Thus, the ALJ's decision to adopt the ME's opinion and omit any additional functional limitations in Ms. Van Cleve's RFC from fibromyalgia was supported by substantial evidence.

---

[10]The Commissioner went outside the ALJ's opinion and found on one page within Dr. Khan's five pages of handwritten, very hard-to-read notes, the notation "T.P. ++" (doc. # 20: Def.'s Mem. in Supp. of Summ. J. at 6, citing R. 596). The Commissioner states that this notation means that Dr. Khan performed a musculoskeletal examination and found Ms. Van Cleve was positive for certain undefined trigger points (*Id.*). In her reply, Ms. Van Cleve accuses the Commissioner of violating the *Chenery* doctrine for raising an issue not raised by the ALJ, but she nevertheless claims that "[t]he Commissioner thus acknowledges that the record does indeed reflect trigger points on examination" (doc. # 24: Pl.'s Reply at 3-4). Whatever the Commissioner acknowledged by citing the brief notation "T.P.++", we find no error in the ALJ's determination that Dr. Khan's treatment notes did not provide adequate evidentiary support for Ms. Van Cleve's claim that she suffers from fibromyalgia.

## C.

Despite the absence of a medical opinion documenting that she has fibromyalgia, Ms. Van Cleve argues that her diagnosis of fibromyalgia "should have been taken into consideration when determining the credibility of [her] statements in relation to her ability to work" (Pl.'s Mem. at 12-13). Plaintiff argues that if the ALJ had found credible her testimony that she has limited use of her hands (which she contends is a symptom of fibromyalgia), the ALJ would have found her disabled because she would have been unable to perform the one job cited by the VE -- bench hand assembler -- because it required constant reaching and handling (*Id.* at 13-15). We disagree that either the ALJ's credibility or Step 5 determinations were erroneous.

We give deference to the ALJ's credibility decision "[b]ecause the ALJ is in the best position to determine a witness's truthfulness and forthrightness . . ." *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (internal quotations and citations omitted). "So long as an ALJ gives specific reasons supported by the record, we will not overturn his credibility determination unless it is patently wrong." *Curvin*, 778 F.3d at 651. Courts "should rarely disturb an ALJ's credibility determination, unless that finding is unreasonable or unsupported." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

The ALJ's credibility determination here was not patently wrong. Plaintiff argues that she "received extensive medical treatment for her symptoms," as shown by her years of taking prescription pain medication and having appointments with numerous different doctors, as well as the results of imaging and scans (Pl.'s Mem. at 14). However, the ALJ had a different interpretation of Ms. Van Cleve's years of visiting doctors and taking prescription pain medication; the ALJ believed this was evidence of substance abuse. The ALJ stated that the "[t]reatment records suggest that the claimant has not used her pain medications properly . . .,

including not using medications as prescribed or using up the medications before refills were authorized" (R. 38). The ALJ noted that Ms. Van Cleve visited numerous doctors for medication refills and obtained multiple prescriptions for the same medication from different medical sources, but rarely sought evaluation and treatment for specific complaints of pain or functional limitations (R. 28, 35). The ALJ did not err by discounting Ms. Van Cleve's testimony based on what he found to be her drug-seeking behavior. *See, e.g.*, *Simila v. Astrue*, 573 F.3d 503, 519-20 (7th Cir. 2009) (holding that the ALJ properly discounted the claimant's testimony where the record showed a pattern of drug-seeking behavior, including multiple physicians who noted that the claimant was overusing his narcotic pain medication); *Berger v. Astrue*, 516 F.3d 539, 545-46 (7th Cir. 2008) (holding that the ALJ properly discounted the claimant's testimony where he had ostensibly engaged in drug-seeking behavior by getting hydrocodone prescribed by one doctor while another doctor was treating him with a regimen of Vicodin and muscle relaxers).

Moreover, the ALJ doubted the credibility of Ms. Van Cleve's complaints of severe pain because "[t]here are no reports suggesting that the claimant has tried other measures to relieve her pain or other symptoms" (R. 39). In fact, the ALJ noted that the only other treatment Ms. Van Cleve did receive -- physical therapy from March 19 to May 24, 2012 (shortly before fibromyalgia was ever mentioned as a diagnosis) -- was discontinued after no reported improvement and the physical therapist "report[ing] that the claimant's mobility was limited when supervised (*i.e.*, obviously observed), and mostly normal when unsupervised (*i.e.*, surreptitiously observed)" (R. 38). The ALJ was entitled to treat this as "damning" evidence that Ms. Van Cleve was exaggerating her symptoms. *See McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011) (upholding the ALJ's adverse credibility determination where her physician noted that the claimant's purported hand tremor appeared voluntarily during examination but was otherwise

absent); *see also Simila*, 573 F.3d at 519-20 (holding that the ALJ properly discounted the claimant's credibility where he was "rather unwilling to participate in physical therapy"); *Berger*, 516 F.3d at 546 (holding that the ALJ properly questioned the credibility of the claimant's complaints of pain because he had failed to pursue physical therapy or other treatment options).

Ms. Van Cleve also challenges the ALJ's determination that her activities of daily living were inconsistent with her alleged limitations because the symptoms of fibromyalgia "wax and wane" and are "entirely subjective" (Pl.'s Mem. at 12-14, quoting *Sarchet v. Chater*, 78 F.3d 305, 308 (7th Cir. 1996)). We note that despite stating that fibromyalgia symptoms were "entirely subjective" in *Sarchet*, the Seventh Circuit recognized that "the rule of thumb" in diagnosing fibromyalgia is the test of whether the patient has at least eleven tender spots. 78 F.3d at 306. An ALJ may properly find incredible a claimant's complaints of suffering pain from fibromyalgia -- and question the reliability of the claimant's testimony that she had received a fibromyalgia diagnosis -- where (as here) no doctor has identified any specific trigger points for her pain. *See Wheeler v. Barnhart*, 177 F. App'x 478, 481-82 (7th Cir. 2006). The ALJ was also entitled to draw an adverse inference from the inconsistencies between Ms. Van Cleve's claimed limitations at the hearing and her multiple earlier representations that she could cook, do laundry, clean, vacuum, wash dishes, drive, shop, walk up to one mile, lift up to 20 pounds, and climb a flight of stairs (R. 33-34). *See Elder*, 529 F.3d at 41 (finding that ALJ's adverse credibility determination was supported by the record where the claimant's testimony regarding the severe functional limitations caused by her fibromyalgia and depression contradicted her reports to her doctor that notwithstanding her pain, she was able to function and to exercise regularly); *see also Berger*, 516 F.3d at 546 (upholding the ALJ's adverse credibility determination regarding the

claimant's claims of disabling back pain where he performed household chores, went fishing, and drove long distances to see his girlfriend).

In addition, the ALJ was entitled to discount Ms. Van Cleve's physicians' reports of her subjective complaints of pain because the physical examinations usually reflected negative findings. *See Loveless*, 2016 WL 147547, at *5. "[A]lthough an ALJ may not ignore a claimant's subjective reports of pain simply because they are not fully supported by objective medical evidence, discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch*, 539 F.3d at 483 (holding that the ALJ reasonably discounted the claimant's testimony given the discrepancy between his reports of disabling gout and medical reports documenting the absence of gout symptoms, including normal ROM and ability to walk without significant limitation). Indeed, "there is no presumption of truthfulness for a claimant's subjective complaints; rather, an ALJ should rely on medical opinions based on objective observations and not solely on a claimant's subjective assertions." *Knox v. Astrue*, 327 F. App'x. 652, 656 (7th Cir. 2009).

Finally, the ALJ's determination that Ms. Van Cleve's testimony about years of severe pain and limited functionality in her hands was not credible is supported by substantial evidence, and thus is not grounds for remand at Step 5. The ALJ noted that other than a complaint in June 2012 to Dr. O'Connor about occasional numbness in her hands and in August 2012 to Dr. Khan, "treatment records are silent as to a complaint of pain in her hands" (R. 36). In addition, the ALJ observed that "records reflect that the claimant had not developed any distal upper extremity pain, numbness, or paresthesias," and that she had normal function and no pain in her hands at the internal consultative medicine evaluation on October 4, 2011 (*Id.*). The ALJ's adverse credibility determination was not "patently wrong" because "his explanation was sufficient to

reasonably conclude that [the claimant] exaggerated the effects of her impairments." *Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013). Thus, the ALJ's determination that Ms. Van Cleve was not disabled is supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied (doc. # 17) and the Commissioner's motion for summary judgment is granted (doc. # 19). The case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATE: February 10, 2016